UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAMIAN ANSON, et al.,

    Plaintiffs,

Case No. 6:23-cv-00766-PGB-LHP

v.

CITY OF DELTONA, a Florida
Municipal corporation,

    Defendant.
_____/

**DEFENDANT'S MOTION TO DISMISS COMPLAINT**

Defendant City of Deltona, pursuant to Federal Rules of Civil Procedure 8 and 12, respectfully moves to dismiss plaintiffs' Complaint (doc. 1-1) as follows:

**1.  Introduction**

Forty-one homeowners (representing, it appears, 26 households) from the Stone Island Estates neighborhood in Volusia County sue the City. The aptly-named Stone *Island* neighborhood is located on the eastern shore of Lake Monroe, and is otherwise surrounded by waterways (creeks and man-made canals). The St. Johns River runs to, and through, Lake Monroe. The neighborhood borders the Lake Monroe Wildlife Management Area, a large state-managed wetland area, to the southeast. To the north is an undeveloped wetland area which is, like the

neighborhood itself, essentially an island surrounded by Lake Monroe and canals. The Bethel Creek and associated wetlands lie east of the neighborhood.[1]

Plaintiffs sue the City as to alleged flooding of their properties, which occurred following Hurricane Ian, which passed through the area in late September 2022.[2] In plaintiffs' Complaint, which they style as a "Class Action Complaint," they assert two inverse condemnation claims, one under the Florida Constitution, the other under the United Stated Constitution (Fifth Amendment).

The City now moves to dismiss the Complaint for failure to state a claim upon which relief can be granted.

## 2. Preliminary statement and reservation of right to contest class certification

The City contests any request from plaintiffs for certification of a class related to their claims. It appears grounds exist, based merely on the Complaint's allegations, which warrant dismissal of plaintiffs' class-based assertions and denial

---

[1] Plaintiffs embedded in their Complaint a Google Earth-generated map which depicts the neighborhood, and the areas and geographic features near and around the neighborhood. Doc. 1-1, ¶ 39.

[2] According to the National Hurricane Center: "Ian made landfall in southwestern Florida at category 4 intensity (on the Saffir-Simpson Hurricane Wind Scale), producing catastrophic storm surge, damaging winds, and historic freshwater flooding across much of central and northern Florida. Ian was responsible for over 150 direct and indirect deaths and over $112 billion in damage, making it the costliest hurricane in Florida's history and the third-costliest in United States history." *See* https://www.nhc.noaa.gov/data/tcr/AL092022_Ian.pdf (last accessed May 18, 2023).

of class certification. But, it appears this Court generally considers class certification issues in the context of a class certification motion, once filed. *See*, *e.g.*, *Carroll v. Wyndham Vacation Resorts Inc.*, No. 6:20-CV-28-ORL-40LRH, 2020 WL 13349031, at *1 (M.D. Fla. July 8, 2020); *Wagner v. CLC Resorts and Devs., Inc.*, 32 F. Supp. 3d 1193, 1198 (M.D. Fla. 2014); *Chaney v. Crystal Beach Capital, LLC*, No. 10-cv-1056-T-30-TGW, 2011 WL 17639, at *2 (M.D. Fla. Jan. 4, 2011). As such, the City refrains from herein arguing against class certification, but respectfully reserves all arguments in this respect.

## 3. Facts alleged[3]

The Complaint alleges each plaintiff—each of whom is ostensibly identified as a "[c]lass representative"—"own[s] real property located in Volusia County, Florida, and [such] property was used, and damaged or destroyed, by Deltona as part of the Deltona Dam Program." Doc. 1-1, ¶¶ 4-30.[4] The Complaint does not

---

[3] While the City certainly contests plaintiffs' overarching assertion that the City caused the complained-of flooding in the Stone Island neighborhood, for purposes of this motion, the City accepts as true the Complaint's well-pled facts, but not the Complaint's conclusory assertions, in particular legal conclusions.

[4] Throughout the Complaint, plaintiffs use the fictious, created name of "Deltona Dam Program" to refer to the City's act of opening the flood control structure, i.e., removing the brick-and-mortar plug, between Lake Doyle and Lake Bethel. This reference to "Deltona Dam Program" is misleading, as it actually concerns a particular act, and not a "Program," so to speak, and as used by plaintiffs such term or phrase gives the false impression of a specific, established "Program" of the City.

specifically identify the properties at issue, whether by address, property description, or other identifier, and does not otherwise describe the properties (size of the home, acreage of the land at issue, elevation of the land, particular damage suffered, etc.). It appears plaintiffs' intent in crafting their Complaint was to bypass providing such basic information through reliance on their effort to assert a class action lawsuit.

The second section of the Complaint asserts supposed "Class Action Allegations." Doc. 1-1, p. 8-10. Plaintiffs propose a class of "[a]ll owners of property within Volusia County, including property located in the Stone Island community, whose property was used, and damaged or destroyed, under the Deltona Dam Program, on or after October 1, 2022. . ." *Id*., ¶ 32. Plaintiffs offer various, conclusory assertions in an attempt to establish a basis for class certification. *Id*., ¶¶ 34-38.

Plaintiffs then collectively allege the City has a drainage system whereby storm water drains from areas of the City to Lake Bethel, located east of the Stone Island neighborhood. *Id*., ¶¶ 40-42. They claim as a result of litigation in 2005, part of the system "was bricked up, closed off, and was no longer used . . . to avoid routing flood waters from the city to and through, for example, the Stone Island community." *Id*., ¶ 42. They claim "[i]n accordance with Deltona's Stormwater and Watershed Management Master Plan, Deltona was aware that opening the flood

4

control structure could result in flooding impact downstream, including for example, the Stone Island community." *Id.*, ¶ 43.[5]

Plaintiffs claim the City requested on three prior occasions that the St. Johns River Water Management District ("District") permit the City "to open the flood control structure," but the District denied such requests. *Id.*, ¶ 44.

Plaintiffs claim before 2022, the Lake Theresa Basin (Lake Doyle) and Lake Bethel "systems" were stable and did not discharge water into the Stone Island neighborhood, and during the prior half-century the neighborhood "never systematically and catastrophically flooded" and "the rate of rising and receding floodwaters during prior storms was always such that homeowners had time to prepare, to secure their belongings, and to otherwise get ready for any rising waters." *Id.*, ¶¶ 45-46.

Plaintiffs claim in the days after Hurricane Ian struck, the City "opened the flood control structure." *Id.*, ¶ 48. This allegedly redirected water to the Stone Island neighborhood, and "resulted in a sudden and catastrophic flow of water. . . ." *Id.*, ¶ 49. Plaintiffs claim the "waters did not catastrophically rise from Lake Monroe, which would have been the expected path of any rising waters, but flowed from

---

[5] Plaintiffs did not attach a copy of the Master Plan to the Complaint.

Deltona and Lake Bethel to, through, and over Stone Island." *Id.*[6] They claim "[o]ver the course of less than one day, the waters in Stone Island rose many feet, resulting in catastrophic damage to the community." *Id.*, ¶ 50.

Plaintiffs claim on October 6, 2022, the City sought a permit from the District to allow the City "to open a brick and mortar plug from [the] Lake Doyle 60-inch outfall pipe to allow the Lake Theresa Basin to discharge to Lake Bethel and eventually to Lake Monroe." *Id.*, ¶ 54. They claim on October 13, 2022, the District granted the permit. *Id.*, ¶ 56.[7] Plaintiffs claim "[t]he *intention* of the permit application was to direct waters from Deltona to, through, and over the real property which stood in the way of Lake Bethel and Lake Monroe, such as Stone Island." *Id.*, ¶¶ 54, 56 (emphasis in original).

Plaintiffs claim the flooding "caused severe damage to" the neighborhood, including but not limited to "[d]amage to and destruction of" structures, personal property, landscaping and outdoor property. *Id.*, ¶ 61. They allege it increased "[c]osts of housing and costs of living" and "[d]ecreased property valuations." *Id.*

---

[6] The Stone Island neighborhood is located directly on Lake Monroe. Doc. 1-1, ¶ 39. Lake Monroe covers 8,771 acres, and the St. Johns River flows to and through it. On October 9, 2022, according to the National Weather Service, the lake reached its highest ever recorded crest. *See* https://water.weather.gov/ahps2/hydrograph.php?gage=snff1&wfo=mlb (last accessed May 18, 2023).

[7] Plaintiffs did not attach copies of any permit documents to the Complaint.

Plaintiffs do not allege the property that allegedly flooded following the hurricane remains, or is permanently, flooded.

Plaintiffs claim the City did not close the flood control structures "up until at least January 2023. . . ." *Id.*, ¶ 63. They claim the "structure is apparently open to the whim of Deltona, and the conditions caused by Deltona's opening of the flood control structure may reasonably expected (sic) to recur." *Id.*

**4.   Claims asserted**

Plaintiffs assert essentially-identical inverse condemnation claims under Counts I and II. Under both counts they claim:

> Deltona's opening of a certain flood control structure (and what ended up being three structures) allowed the Lake Theresa Basin (Lake Doyle) to discharge to Lake Bethel, and then directly to the west to, through, and over Stone Island. This resulted in the use of, and damage and destruction to, property owned by the Stone Island Homeowners and the Class, and constituted a seizure or physical invasion of their property rights.

Doc. 1-1, ¶¶ 69, 77.

Plaintiffs claim the City "took a drainage easement . . . under the Deltona Dam Program" and this "constituted a substantial interference with the property rights . . . for more than a momentary period, and which resulted in the substantial deprivation of the beneficial use of these property rights." *Id.*, ¶¶ 67, 70, 75, 78. They claim the City's "seizure of a drainage easement, to use Stone Island to create a floodplain,

7

resulting in damage to and destruction of property in Stone Island, constitutes a *per se* taking . . . and is permanent in nature." *Id*., ¶¶ 71, 79.

Under Counts I and II, plaintiffs seek an order of taking, the empanelment of a 12-person jury to determine compensation, pre- and post-judgment interest, and an award of attorneys' fees and costs. *Id*., p. 16 ("wherefore" para.), p. 18 ("wherefore" para.).

**5.     Motion to dismiss standard**

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and rule 8(d)(1) requires that "each allegation must be simple, concise, and direct." Thus, to survive a rule 12(b)(6) motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  Courts are generally limited to the four corners of a complaint, *see St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002), but they may also consider attached exhibits and documents referred to in the complaint that are central to the claim, *see Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).  And, a court

may also "take judicial notice of certain facts—including public records—without converting a motion to dismiss" to a summary judgment motion. *Anderson v. AIG Prop. Cas. Co.*, No. 220CV774FTM38MRM, 2020 WL 6321867, at *1 (M.D. Fla. Oct. 28, 2020) (citing *DeBose v. Ellucian Co., L.P.*, 802 F. App'x 429, 433 (11th Cir. 2019)).

Though a complaint need not contain detailed factual allegations, mere legal conclusions or recitation of the elements of a claim are not enough. *Twombly*, 550 U.S. at 555. Moreover, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts must also view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994) (per curiam).

"In sum, courts must (1) ignore conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; (2) accept well-pled factual allegations as true; and (3) view well-pled allegations in the light most favorable to the plaintiff." *Rhodes v. Embry-Riddle Aeronautical Univ., Inc.*, 513 F. Supp. 3d 1350, 1354 (M.D. Fla. 2021) (citing *Iqbal*, 556 U.S. at 679).

## 6. Counts I and II warrant dismissal

### A. Flood-related inverse condemnation claims generally

Inverse condemnation, or "taking," claims may arise under the United States Constitution and the Florida Constitution. U.S. Const. amend. V.; Art. X, § 6, Fla. Const. "The Takings Clause of the Florida Constitution is identical to that of the United States Constitution, and accordingly, the two can be analyzed coextensively." *Persaud Properties FL Invs., LLC v. Town of Fort Myers Beach, Fla.*, 593 F. Supp. 3d 1129, 1137 (M.D. Fla. 2022) (citing *Highlands-In-The-Woods, L.L.C. v. Polk Cnty.*, 217 So. 3d 1175, 1180 (Fla. 2d DCA 2017)). Inverse condemnation occurs when the government takes "property by 1) entering upon the private property for more than a momentary period and 2) under the color of legal authority, 3) devoting it to a public use, or 4) otherwise appropriating or injuriously affecting it in such a way as substantially to oust the owner and deprive him of all beneficial enjoyment thereof." *TLC Properties, Inc. v. Dep't of Transp.*, 292 So. 3d 10, 14 (Fla. 1st DCA 2020) (citation omitted);[8] *see Hansen v. City of Deland*, 32 So. 3d 654, 655 (Fla. 5th DCA 2010) ("A property owner can file an inverse condemnation claim to recover

---

[8] "The first three elements typically apply to physical occupation cases, whereas the fourth element applies to other forms of takings, such as regulatory takings where the appropriate inquiry is directed to the extent of the interference or deprivation of economic use of the property." *Id.* (citation, internal quotation marks, and brackets omitted).

the value of property that has been *de facto* taken by a government entity." (citation omitted)).

Plaintiffs assert inverse condemnation claims based on alleged flooding. As the First District Court of Appeal has explained, the government takes property:

> when it directs a concentrated flow of water from one property onto another, permanently depriving the owner of all beneficial enjoyment of their property. *Leon County v. Smith*, 397 So. 2d 362, 364 (Fla. 1st DCA 1981); *Martin v. City of Monticello*, 632 So. 2d 236, 237 (Fla. 1st DCA 1994). To assert an inverse condemnation claim based on such governmental action, the property owner must demonstrate that the government's action constitutes a substantial interference with her private property rights for more than a momentary period, and will be continuous or reasonably expected to continuously recur, resulting in a substantial deprivation of the beneficial use of her property. *See Elliott v. Hernando County*, 281 So. 2d 395, 396 (Fla. 2d DCA 1973) (noting that "rain is a condition that is reasonably expected to continually re-occur in the future"); *Assoc. of Meadow Lake, Inc. v. City of Edgewater*, 706 So. 2d 50 (Fla. 5th DCA 1998); *cf. Diamond K Corp. v. Leon County*, 677 So. 2d 90 (Fla. 1st DCA 1996) (holding that no taking occurred as a result of flooding of a creek in the appellant's property because the appellant had not shown that a continuing physical invasion occurred, depriving it of all reasonable use of its property). A taking is more likely to have occurred when a governmental action confers a public benefit rather than prevents a public harm. *Graham v. Estuary Properties, Inc.*, 399 So. 2d 1374, 1381 (Fla. 1981).

*Drake v. Walton Cnty.*, 6 So. 3d 717, 720-21 (Fla. 1st DCA 2009); *see Modern, Inc. v. Fla.*, 2008 WL 239148, at *8 (M.D. Fla. Jan. 28, 2008) ("[S]tate action that causes flooding on abutting private property may constitute a taking where the flooding is a permanent invasion of land amounting to an appropriation.") (citation omitted); *Williams Farms P'ship v. Am. Citrus Prod. Corp.*, No. 2:06-CV-519FTM29DNF,

2007 WL 1837911, at *2 (M.D. Fla. June 26, 2007) ("For flooding to support a claim of inverse condemnation, the flooding must be an actual, permanent invasion of the land, amounting to an appropriation of the property, not just an injury to the property.") (citing *S. Fla. Water Mgmt. Dist. v. Basore of Fla., Inc.*, 723 So. 2d 287, 288 (Fla. 4th DCA 1998)); *Basore*, 723 So. 2d at 288 (holding the flooding must be an actual, permanent invasion of the land, amounting to an appropriation of, and not merely an injury to, the property); *Assocs. of Meadow Lake, Inc. v. City of Edgewater*, 706 So. 2d 50, 52 (Fla. 5th DCA 1998) (holding if substantial periodic flooding occurred and was expected to recur and such flooding denied landowner any reasonable use of its property because a city defectively constructed its project, a claim for inverse condemnation would lie); *Dudley v. Orange Cnty.*, 137 So. 2d 859, 863 (Fla. 2d DCA 1962) ("[T]he flooding must constitute an actual, permanent invasion of the land, amounting to an appropriation of, and not merely an injury to, the property"), *cert. den.*, 372 U.S. 959 (1963).

As indicated, the impact of the flooding must amount to a "substantial deprivation of all beneficial use of" the property. *Hansen*, 32 So. 3d at 656; *Drake*, 6 So. 3d at 720 ("[A] county takes private property when it directs a concentrated flow of water from one property onto another, permanently depriving the owner of all beneficial enjoyment of their property."); *Leon Cnty. v. Smith*, 397 So. 2d 362, 364 (Fla. 1st DCA 1981) (affirming ruling which found a taking where the "trial

judge correctly found that a taking resulted from flooding which rendered the land useless and permanently deprived plaintiffs of all beneficial enjoyment thereof." (citations omitted)). In *Hansen*, after a series of floods, the City of Deland pumped storm water from one area of the city to another. Although the city never pumped water directly onto the plaintiffs' properties, after the pumping, the water on the plaintiffs' properties measured 12 feet deep, and the property remained flooded for about 15 months, resulting in the loss of numerous trees. *Id*. at 655. The Fifth District Court of Appeal affirmed the trial court's denial of the inverse condemnation claim, finding the "landowners offered no evidence demonstrating that they suffered a substantial deprivation of all beneficial use of their properties." *Id*. at 656. The trial court found "the water did not affect the house or driveway on either property; only about one-tenth of one yard and one-third of the other yard was under water; the tree damage was aesthetic, not commercial damage; and the parties were allowed full use of their homes during the flooding." *Id*. at 655.

Additionally, a party must demonstrate the interference with the property "will be continuous or reasonably expected to continuously recur. . . ." *Drake*, 6 So. 3d 717, 720 (citations omitted). Indeed, the United States Supreme Court has "consistently distinguished between flooding cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages

13

within, on the other." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 428 (1982). And, "[a] taking has always been found only in the former situation." *Id.* (citing *United States v. Kansas City Life Ins. Co.*, 339 U.S. 799, 809-10 (1950); *Sanguinetti v. United States*, 264 U.S. 146, 149 (1924); *U.S. v. Cress*, 243 U.S. 316, 327-28 (1917); *Bedford v. United States*, 192 U.S. 217, 225 (1904); *United States v. Lynah*, 188 U.S. 445, 468-70 (1903)). In considering whether flooding amounts to a taking, "the court must consider the frequency of the flooding." *Stueve Bros. Farms, LLC v. United States*, 105 Fed. Cl. 760, 765 (Fed. Cl. 2012), *aff'd*, 737 F.3d 750 (Fed. Cir. 2013), and *aff'd*, 737 F.3d 750 (Fed. Cir. 2013). " '[I]solated invasions, such as one or two floodings . . . do not make a taking . . . but repeated invasions of the same type have often been held to result in an involuntary servitude.' " *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355-57 (Fed. Cir. 2003) (omissions in original) (quoting *Eyherabide v. United States*, 345 F.2d 565, 569 (Fed. Ct. Cl. 1965)); *see United States v. Cress*, 243 U.S. 316, 328 (1917) ("There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a permanent liability to intermittent but inevitably recurring overflows. . . .").

Finally, "mere injury to the land not amounting to an appropriation of the land is insufficient" to support an inverse condemnation claim. *Williams Farms P'ship*, 2007 WL 1837911, at *2; *see Basore*, 723 So. 2d at 289 (finding crop destruction

14

"was a consequential damage resulting from the temporary flooding and not a constitutional taking."); *Dudley*, 137 So. 2d at 863 (requiring an actual, permanent invasion of land amounting to appropriation, and "not merely an injury to, the property").

**B. The Complaint does not contain sufficient factual matter which, if accepted as true, states an inverse condemnation claim.**

The Complaint's allegations are stated in exceedingly generalized terms. Each of the 41 plaintiffs identically alleges his or her "property was used, and damaged or destroyed, by Deltona. . . ." Doc. 1-1, ¶¶ 4-30. They each allege they "owned property . . . which was used, and damaged or destroyed, by Deltona. . . ." *Id.*, ¶ 35. They claim "[t]he immediate and intense flooding . . . caused severe damage to" them, and they list general categories of damage. *Id.*, ¶ 61. Then, under Counts I and II, they assert "Deltona's seizure of a drainage easement, to use Stone Island to create a floodplain, result[ed] in damage to and destruction of property in Stone Island. . . ." *Id.*, ¶¶, 71, 79.

Absent from the Complaint are non-generalized, non-conclusory allegations from any of the plaintiffs (or even each household in the plaintiff group) which support a conclusion that each named plaintiff suffered some manner of substantial interference with his or her property. Even the broad, generalized allegations complain of damage to, but not appropriation of, property. But, the analysis of

whether flooding might amount to substantial interference with property, and/or an appropriation of property, must take into account the characteristics of the property at issue—i.e., each property at issue—and the specific impact ostensibly suffered as to the property relative to the alleged flooding.  For example, putting aside the issue of duration or expected recurrence (addressed below), superficial "flooding" in a yard is very different than, perhaps, waist-deep flooding in one's living room.  In the Complaint, plaintiffs allege no actual facts in this respect whatsoever—quite intentionally, it seems, as it appears their intent is to bypass the basic, individual rule 8 pleading requirements through collective reliance on the case's supposed suitability for class action certification.  As pled, the Complaint offers little more than a group chorus of "we were flooded" and "we were damaged."  This is insufficient, and plaintiffs fail to plead valid claims of flood-related inverse condemnation.  *See Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) ("[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.").

Moreover, the Complaint fails to allege facts to support any supposed permanency of an alleged flooding condition, or indicate the flooding is intermittent but will inevitably recur.  *See Drake*, 6 So. 3d at 720 ("[T]he property owner must demonstrate that the government's action . . . will be continuous or reasonably expected to continuously recur. . . .").  Plaintiffs appear to concede the flooding

16

associated with Hurricane Ian has abated, and the City has closed "the flood control structures." Doc. 1-1, ¶ 63. But, they generally, and in conclusory terms, claim the condition "may reasonably [be] expected to recur." *Id*. Conclusory as it is, this appears to be the sole statement in the Complaint that relates to the supposed recurrence of the alleged condition. But simply saying in conclusory terms that "it will happen again" without factual support is insufficient. *See Davila*, 326 F.3d at 1185. Plaintiffs offer no facts that support this generalized, speculative "expected to recur" assertion. Putting aside unsupported assertions, plaintiffs merely allege a one-time flooding event associated with a major hurricane. This is insufficient to support a valid inverse condemnation claim. *See Ridge Line, Inc.*, 346 F.3d at 1355-57 ("[I]solated invasions, such as one or two floodings . . . do not make a taking . . . but repeated invasions of the same type have often been held to result in an involuntary servitude." (citation, internal quotation marks omitted)); *Stueve Bros. Farms*, 105 Fed. Cl. at 764 ("[T]he apprehension of future flooding created by flood control legislation and the beginning of construction does not impose a flowage easement on a property that may be burdened by future flooding." (citation, internal quotation marks omitted)).

Finally, the Complaint is clear that plaintiffs truly complain of damage to their real or personal property, in association with a one-time flood event associated with a major hurricane. The Complaint includes dozens of references to damage. Putting

17

aside whether claims of "damage" to property might, conceivably, support some other form of claim against a governmental entity, mere damage without occupation of property is not sufficient to support an inverse condemnation claim. *See Loretto*, 458 U.S. at 428 (distinguishing between "flooding cases involving a permanent physical occupation . . . and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages. . . ." (citations omitted)); *Williams Farms P'ship.*, 2007 WL 1837911 at *2 ("[M]ere injury to the land not amounting to an appropriation of the land is insufficient."). As the Complaint is pled, it merely asserts a claim for damages, and thus fails to allege a valid inverse condemnation claim.

In a nutshell, the Complaint does not "contain sufficient *factual* matter" which, if accepted as true, states one or more claims for inverse condemnation. *Ashcroft*, 556 U.S. at 678 (emphasis added). The Complaint's assertions are generalized, formulaic, and conclusory, and at most assert a joint, general claim of damage related to a one-time flooding event associated with a major hurricane. Thus, the Complaint's allegations do not support a claim for inverse condemnation, and the Complaint should be dismissed.

**7. Conclusion**

For the reasons discussed, the City respectfully submits plaintiffs' Complaint should be dismissed.

## LOCAL RULE 3.01(g) CERTIFICATION

Defendant certifies that: A) it, through its undersigned counsel, conferred with plaintiffs before filing this motion; B) plaintiffs do not agree on the resolution of all or part of this motion; and C) this motion is opposed, and the conferral occurred via telephone on May 18, 2023.

Respectfully submitted this 18th day of May, 2023.

                                        ROPER, P.A.

By: /s/ Dale A. Scott
Dale A. Scott, Esq.
Fla. Bar No. 568821
dscott@roperpa.com
ehemphill@roperpa.com
2707 E. Jefferson St.
Orlando, FL 32803
Tel: 407-897-5150
Fax: 407-897-3332
Counsel for City of Deltona

## CERTIFICATE OF SERVICE

I certify that a copy of this document has been furnished via e-mail on this 18th day of May, 2023, to:

Thomas C. Allison, Esq.
thomas@allisonpa.com
Thomas C. Allison, P.A.
5433 S. Bracken Ct.
Winter Park, FL 32792
Counsel for Plaintiffs

Andrew Bernard Doyle, Esq.
andrew@sd-firm.com
micky@sd-firm.com
Seibane Doyle, PLLC
913 Mabbette St.
Kissimmee, FL 34741
Counsel for Plaintiffs

          By:   <u>/s/ Dale A. Scott</u>
                Dale A. Scott, Esq.