UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAMIAN ANSON, et al.,

                                 Case No. 6:23-cv-00766-PGB-LHP

      Plaintiffs,

v.

CITY OF DELTONA, a Florida
Municipal corporation,

      Defendant.
_____/

## DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT

Defendant City of Deltona, pursuant to Federal Rules of Civil Procedure 8 and 12, respectfully moves to dismiss plaintiffs' Amended Complaint (dk. 27) as follows:

**1.**    **Introduction**

Plaintiffs are homeowners from the Stone Island Estates neighborhood in Volusia County.  The aptly-named Stone *Island* neighborhood is located on the eastern shore of Lake Monroe, and is otherwise surrounded by waterways (creeks and man-made canals).[1]  The St. Johns River runs to, and through, Lake Monroe. The neighborhood borders the Lake Monroe Wildlife Management Area, a large

---

[1] In their initial Complaint, plaintiffs embedded a Google Earth-generated map which depicts the neighborhood, and the areas and geographic features near and around the neighborhood.  Dk. 1-1, ¶ 39.

state-managed wetland area, to the southeast.  To the north is an undeveloped wetland area which is, like the neighborhood, essentially an island surrounded by Lake Monroe and canals.  The Bethel Creek and associated wetlands lie east of the neighborhood.

Plaintiffs sue the City as to alleged flooding of their properties, which occurred following Hurricane Ian, which passed through the area in late September 2022.[2]  In plaintiffs' Amended Complaint, which they continue to style as a "Class Action Complaint," they assert inverse condemnation claims under the Florida Constitution and the United States Constitution (Fifth Amendment).

The City now moves to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted.

## 2.     Preliminary statement and reservation of right to contest class certification.

The City contests any request from plaintiffs for class certification.  It appears grounds exist, based merely on the Amended Complaint's allegations, which warrant

---

[2] According to the National Hurricane Center:  "Ian made landfall in southwestern Florida at category 4 intensity (on the Saffir-Simpson Hurricane Wind Scale), producing catastrophic storm surge, damaging winds, and historic freshwater flooding across much of central and northern Florida.  Ian was responsible for over 150 direct and indirect deaths and over $112 billion in damage, making it the costliest hurricane in Florida's history and the third-costliest in United States history."  *See* https://www.nhc.noaa.gov/data/tcr/AL092022_Ian.pdf (last accessed Aug. 15, 2023).

dismissal of plaintiffs' class-based assertions and denial of class certification. But, it appears this Court generally considers class certification issues in the context of a class certification motion, once filed. *See*, *e.g*., *Carroll v. Wyndham Vacation Resorts Inc*., No. 6:20-CV-28-ORL-40LRH, 2020 WL 13349031, at *1 (M.D. Fla. July 8, 2020); *Wagner v. CLC Resorts and Devs*., *Inc*., 32 F. Supp. 3d 1193, 1198 (M.D. Fla. 2014); *Chaney v. Crystal Beach Capital*, *LLC*, No. 10-cv-1056-T-30-TGW, 2011 WL 17639, at *2 (M.D. Fla. Jan. 4, 2011). As such, the City refrains from herein arguing against class certification, but respectfully reserves all arguments in this respect.[3]

### 3.   Facts alleged[4]

The Amended Complaint alleges each plaintiff—each of whom is ostensibly identified as a "[c]lass representative"—"own[s] real property located in Volusia County, Florida, and [such] property was used, and damaged or destroyed, by Deltona as part of the Deltona Interconnect Program." Dk. 27, ¶¶ 4-48.[5]  The

---

[3] The Court has set a deadline of February 26, 2024, for any motion for class certification. Dk. 17, p. 1.

[4] While the City contests plaintiffs' overarching assertion that the City caused the complained-of flooding in the Stone Island neighborhood, for purposes of this motion, the City accepts as true the Amended Complaint's well-pled facts, but not the Amended Complaint's conclusory assertions, in particular legal conclusions.

[5] Throughout the Amended Complaint, plaintiffs use the term "Deltona Interconnect Program" to refer to the City's act of opening "the flood control structure" (itself an inaccurate and contrived term which plaintiffs repeat throughout the Amended Complaint), i.e., the City's act of removing the brick-and-mortar plug,

Amended Complaint does not specifically identify the properties at issue, whether by address, property description, or other identifier, and does not otherwise describe the properties (size of the home, acreage of the land at issue, elevation of the land, particular damage suffered, etc.).   It appears plaintiffs' intent in crafting their Amended Complaint was to bypass providing such basic information through reliance on their effort to assert a class action lawsuit.

The second section of the Amended Complaint asserts supposed "Class Action Allegations."  Dk. 27, p. 19-21.  Plaintiffs propose a class of "[a]ll owners of property within Volusia County, including property located in the Stone Island community, whose property was used, and damaged or destroyed, under the Deltona Interconnect Program, on or after September 29, 2022 (the 'Class')."  *Id.*, ¶ 50. Plaintiffs offer various, conclusory assertions in an attempt to establish a basis for class certification.  *Id.*, ¶¶ 50-56.

Plaintiffs then collectively allege the City has a drainage system whereby storm water drains from areas of the City to Lake Bethel, located east of their neighborhood.  *Id.*, ¶¶ 57-60.  They claim as a result of litigation in 2005, part of the

---

between Lake Doyle and Lake Bethel.  In the initial Complaint, plaintiff used a different term, "the Deltona Dam Program," in this respect.  The reference to "Deltona Interconnect Program" is misleading, as it actually concerns a particular act, and not a "Program," so to speak, and as used by plaintiffs it gives the false impression of a specific, established City "Program."

system "was bricked up, closed off, and was no longer used." *Id.*, ¶ 61. They allege the "purpose of closing the flood control structure was to avoid routing flood waters from the city (north) to and through, for example, the Stone Island community (south)." *Id.* They claim in "accordance with Deltona's Stormwater and Watershed Management Master Plan, Deltona was aware that opening the flood control structure could result in flooding impact downstream, including for example, the Stone Island community." *Id.*, ¶ 62.[6] Plaintiffs claim the City requested on three prior occasions that the St. Johns River Water Management District ("District") permit the City "to open the flood control structure," but the District denied the requests. *Id.*, ¶ 63.

Plaintiffs claim before 2022, the Lake Theresa Basin (Lake Doyle) and Lake Bethel "systems" were stable and did not discharge water into the Stone Island neighborhood, and during the prior half-century the neighborhood "never systematically and catastrophically flooded" and "the rate of rising and receding floodwaters during prior storms was always such that homeowners had time to prepare, to secure their belongings, and to otherwise get ready for any rising waters." *Id.*, ¶¶ 64-65.

---

[6] Plaintiffs did not attach a copy of the Master Plan to the Amended Complaint.

Plaintiffs claim in the days after Hurricane Ian struck, the City "unilaterally opened the flood control structure." *Id.*, ¶ 67. This allegedly redirected water to the neighborhood and "resulted in a sudden and catastrophic flow of water. . . ." *Id.*, ¶ 68. Plaintiffs claim the "waters did not catastrophically rise from Lake Monroe, which would have been the expected path of any rising waters, but flowed from Deltona and Lake Bethel to, through, and over Stone Island." *Id.*[7] They claim "[o]ver the course of less than one day, the waters in Stone Island rose many feet, resulting in catastrophic damage to the community." *Id.*, ¶ 69.

Plaintiffs claim on October 6, 2022, the City sought a permit from the District to allow the City "to open a brick and mortar plug from Lake Doyle's 60-inch outfall pipe to allow the Lake Theresa Basin to discharge to Lake Bethel and eventually to Lake Monroe." *Id.*, ¶ 73. They claim on October 13, 2022, the District granted the permit. *Id.*, ¶ 75.[8] Plaintiffs claim "[t]he *intention* of the permit application was to direct waters from Deltona to, through, and over the real property which stood in the

---

[7] The Stone Island neighborhood is located on Lake Monroe. The lake covers 8,771 acres, and the St. Johns River flows to and through it. On October 9, 2022, according to the National Weather Service, the lake reached its highest ever recorded crest. *See* https://water.weather.gov/ahps2/hydrograph.php?gage=snff1&wfo=mlb (last accessed Aug. 15, 2023).

[8] Plaintiffs did not attach copies of any permit documents to the Amended Complaint.

way of Lake Bethel and Lake Monroe, such as Stone Island." *Id.* (emphasis in original).

Plaintiffs claim the City did not close the flood control structure "up until at least January 2023. . . ." *Id.*, ¶ 80. They claim the control structure may be opened at "the whim of Deltona, and the conditions caused by Deltona's opening of the flood control structure may reasonably expected (sic) to recur." *Id.*

Through allegations added via the Amended Complaint, plaintiffs inconsistently (inconsistent relative to their "up until at least January 2023" allegation, *id.*, ¶ 80) allege the City "has *not* closed the structure and as of the filing of this amended complaint has no intention to do so." *Id.*, ¶ 81 (emphasis in original). And, they allege as the "structures *remain open*, and are subject to being closed and reopened at the whim of Deltona, regardless of any operative SJRWMD permit controls" and the "conditions caused by Deltona may reasonably be expected to continually reoccur in the future." *Id.*, ¶ 82 (emphasis in original).[9]

---

[9] Whether the City has or has not "closed the structure," dk. 27, ¶ 81, is immaterial to the City's arguments asserted below, namely as plaintiffs still do not allege facts to support any supposed permanency of an alleged flooding condition, or which indicate the flooding is intermittent but will inevitably recur. That said, the allegation that the City has not "closed the structure" is incorrect. Moreover, from a hydrological and engineering perspective, whether the structure was or is open or closed has essentially no effect—even during a hurricane—on the water level of the connected bodies of water which surround the neighborhood (namely, Lake Monroe and the St. Johns River), and such level determines whether the neighborhood might experience flooding.

Plaintiffs claim the flooding "caused severe damage to" the neighborhood, including but not limited to "[d]amage to and destruction of" structures, personal property, landscaping and outdoor property.  *Id*., ¶ 85.  They allege it increased "[c]osts of housing and costs of living" and "[d]ecreased property valuations."  *Id*. Plaintiffs do not allege the property that allegedly flooded following the hurricane remains, or is permanently, flooded.  Through a series of paragraphs added via the Amended Complaint, plaintiffs identically (it appears) allege they:  "suffered the following damages: damage to and destruction of structures; damage to and destruction of personal property; damage to and destruction of landscaping and outdoor property; costs of housing and costs of living based on deprivation and loss of access to property; decreased property valuations."  *Id*., ¶¶ 86-130.  Several plaintiffs provide specific dollar figures for the damages they allegedly suffered (for example, they allege "DAMIAN ANSON's damages are at least $300,000," *id*., ¶ 86).

### 4.   Claims asserted

Plaintiffs assert essentially-identical inverse condemnation claims under Counts I and II of the Amended Complaint.  Under both counts they claim:

> Deltona's opening of a certain flood control structure (and what ended
> up being three structures) allowed the Lake Theresa Basin (Lake Doyle)
> to discharge to Lake Bethel, and then directly to the west to, through,
> and over Stone Island.  This resulted in the use of, and damage and
> destruction to, property owned by the Stone Island Homeowners and

8

the Class, and constituted a seizure or physical invasion of their property rights.

Dk. 27, ¶¶ 136, 144.

Plaintiffs claim the City has taken a "drainage easement, for the diversion of water to, through, and over Stone Island" and this "easement under the Deltona Interconnect Program, constituted a substantial interference with the property rights . . . for more than a momentary period, and which resulted in the substantial deprivation of the beneficial use of these property rights." *Id*., ¶¶ 134, 137, 142, 145. They claim the City's "seizure of a drainage easement, to use Stone Island to create a floodplain, resulting in damage to and destruction of property in Stone Island, constitutes a taking . . . and is permanent in nature." *Id*., ¶¶ 138, 146.

Under Counts I and II, plaintiffs seek an order of taking, the empanelment of a 12-person jury to determine compensation, pre- and post-judgment interest, and an award of attorneys' fees and costs. *Id*., p. 43 ("wherefore" para.), p. 45 ("wherefore" para.).

## 5.   **Motion to dismiss standard**

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and rule 8(d)(1) requires that "each allegation must be simple, concise, and direct." Thus, to survive a rule 12(b)(6) motion to dismiss, the complaint "must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  Courts are generally limited to the four corners of a complaint, *see St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002), but they may also consider attached exhibits and documents referred to in the complaint that are central to the claim, *see Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).  And, a court may also "take judicial notice of certain facts—including public records—without converting a motion to dismiss" to a summary judgment motion.  *Anderson v. AIG Prop. Cas. Co.*, No. 220CV774FTM38MRM, 2020 WL 6321867, at *1 (M.D. Fla. Oct. 28, 2020) (citing *DeBose v. Ellucian Co., L.P.*, 802 F. App'x 429, 433 (11th Cir. 2019)).

Though a complaint need not contain detailed factual allegations, mere legal conclusions or recitation of the elements of a claim are not enough.  *Twombly*, 550 U.S. at 555.  Moreover, courts are "not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal*, 556 U.S. at 679.  Courts must also view the

complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994) (per curiam).

"In sum, courts must (1) ignore conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; (2) accept well-pled factual allegations as true; and (3) view well-pled allegations in the light most favorable to the plaintiff." *Rhodes v. Embry-Riddle Aeronautical Univ., Inc.*, 513 F. Supp. 3d 1350, 1354 (M.D. Fla. 2021) (citing *Iqbal*, 556 U.S. at 679).

## 6.   Counts I and II warrant dismissal

### A.   Flood-related inverse condemnation claims generally.

Inverse condemnation, or "taking," claims may arise under the United States Constitution and the Florida Constitution. U.S. Const. amend. V.; Art. X, § 6, Fla. Const.  "The Takings Clause of the Florida Constitution is identical to that of the United States Constitution, and accordingly, the two can be analyzed coextensively." *Persaud Properties FL Invs., LLC v. Town of Fort Myers Beach, Fla.*, 593 F. Supp. 3d 1129, 1137 (M.D. Fla. 2022) (citing *Highlands-In-The-Woods, L.L.C. v. Polk Cnty.*, 217 So. 3d 1175, 1180 (Fla. 2d DCA 2017)).  Inverse condemnation occurs when the government takes "property by 1) entering upon the private property for more than a momentary period and 2) under the color of legal authority, 3) devoting it to a public use, or 4) otherwise appropriating or injuriously affecting it in such a

11

way as substantially to oust the owner and deprive him of all beneficial enjoyment thereof." *TLC Properties, Inc. v. Dep't of Transp.*, 292 So. 3d 10, 14 (Fla. 1st DCA 2020) (citation omitted);[10] *see Hansen v. City of Deland*, 32 So. 3d 654, 655 (Fla. 5th DCA 2010) ("A property owner can file an inverse condemnation claim to recover the value of property that has been *de facto* taken by a government entity." (citation omitted)).

Plaintiffs assert inverse condemnation claims based on alleged flooding.  As the First District Court of Appeal has explained, the government takes property:

> when it directs a concentrated flow of water from one property onto another, permanently depriving the owner of all beneficial enjoyment of their property.  *Leon County v. Smith*, 397 So. 2d 362, 364 (Fla. 1st DCA 1981); *Martin v. City of Monticello*, 632 So. 2d 236, 237 (Fla. 1st DCA 1994).  To assert an inverse condemnation claim based on such governmental action, the property owner must demonstrate that the government's action constitutes a substantial interference with her private property rights for more than a momentary period, and will be continuous or reasonably expected to continuously recur, resulting in a substantial deprivation of the beneficial use of her property.  *See Elliott v. Hernando County*, 281 So. 2d 395, 396 (Fla. 2d DCA 1973) (noting that "rain is a condition that is reasonably expected to continually re-occur in the future"); *Assoc. of Meadow Lake, Inc. v. City of Edgewater*, 706 So. 2d 50 (Fla. 5th DCA 1998); *cf. Diamond K Corp. v. Leon County*, 677 So. 2d 90 (Fla. 1st DCA 1996) (holding that no taking occurred as a result of flooding of a creek in the appellant's property because the appellant had not shown that a continuing physical invasion

---

[10] "The first three elements typically apply to physical occupation cases, whereas the fourth element applies to other forms of takings, such as regulatory takings where the appropriate inquiry is directed to the extent of the interference or deprivation of economic use of the property." *Id.* (citation, internal quotation marks, and brackets omitted).

> occurred, depriving it of all reasonable use of its property).  A taking is more likely to have occurred when a governmental action confers a public benefit rather than prevents a public harm.  *Graham v. Estuary Properties, Inc.*, 399 So. 2d 1374, 1381 (Fla. 1981).

*Drake v. Walton Cnty.*, 6 So. 3d 717, 720-21 (Fla. 1st DCA 2009); *see Modern, Inc. v. Fla.*, 2008 WL 239148, at *8 (M.D. Fla. Jan. 28, 2008) ("[S]tate action that causes flooding on abutting private property may constitute a taking where the flooding is a permanent invasion of land amounting to an appropriation.") (citation omitted); *Williams Farms P'ship v. Am. Citrus Prod. Corp.*, No. 2:06-CV-519FTM29DNF, 2007 WL 1837911, at *2 (M.D. Fla. June 26, 2007) ("[T]he flooding must be an actual, permanent invasion of the land, amounting to an appropriation of the property, not just an injury to the property.") (citing *S. Fla. Water Mgmt. Dist. v. Basore of Fla., Inc.*, 723 So. 2d 287, 288 (Fla. 4th DCA 1998)); *Basore*, 723 So. 2d at 288 (holding the flooding must be an actual, permanent invasion, amounting to an appropriation of, and not merely an injury to, the property); *Assocs. of Meadow Lake, Inc. v. City of Edgewater*, 706 So. 2d 50, 52 (Fla. 5th DCA 1998) (holding if substantial periodic flooding occurred and was expected to recur and such flooding denied landowner any reasonable use of its property because a city defectively constructed its project, a claim for inverse condemnation would lie); *Dudley v. Orange Cnty.*, 137 So. 2d 859, 863 (Fla. 2d DCA 1962) ("[T]he flooding must

constitute an actual, permanent invasion of the land, amounting to an appropriation of, and not merely an injury to, the property"), *cert. den.*, 372 U.S. 959 (1963).

As indicated, the impact of the flooding must amount to a "substantial deprivation of all beneficial use of" the property. *Hansen*, 32 So. 3d at 656; *Drake*, 6 So. 3d at 720 ("[A] county takes private property when it directs a concentrated flow of water from one property onto another, permanently depriving the owner of all beneficial enjoyment of their property."); *Leon Cnty. v. Smith*, 397 So. 2d 362, 364 (Fla. 1st DCA 1981) ("The trial judge correctly found that a taking resulted from flooding which rendered the land useless and permanently deprived plaintiffs of all beneficial enjoyment thereof." (citations omitted)).   In *Hansen*, after a series of floods, the City of Deland pumped storm water from one area of the city to another. Although the city never pumped water directly onto the plaintiffs' properties, after the pumping, the water on the plaintiffs' properties measured 12 feet deep, and the property remained flooded for about 15 months, resulting in the loss of numerous trees. *Id*. at 655.  The Fifth District Court of Appeal affirmed the trial court's denial of the inverse condemnation claim, finding the "landowners offered no evidence demonstrating that they suffered a substantial deprivation of all beneficial use of their properties." *Id*. at 656.  The trial court found "the water did not affect the house or driveway on either property; only about one-tenth of one yard and one-third of the other yard was under water; the tree damage was aesthetic, not commercial

damage; and the parties were allowed full use of their homes during the flooding." *Id*. at 655.

Additionally, a party must demonstrate the flooding "will be continuous or reasonably expected to continuously recur. . . ." *Drake*, 6 So. 3d 717, 720 (citations omitted). The United States Supreme Court has "consistently distinguished between flooding cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages within, on the other." *Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419, 428 (1982). And, "[a] taking has always been found only in the former situation." *Id*. (citing *United States v. Kansas City Life Ins*. *Co*., 339 U.S. 799, 809-10 (1950); *Sanguinetti v. United States*, 264 U.S. 146, 149 (1924); *U.S. v. Cress*, 243 U.S. 316, 327-28 (1917); *Bedford v. United States*, 192 U.S. 217, 225 (1904); *United States v. Lynah*, 188 U.S. 445, 468-70 (1903)). In considering whether flooding amounts to a taking, "the court must consider the frequency of the flooding." *Stueve Bros. Farms*, *LLC v. United States*, 105 Fed. Cl. 760, 765 (Fed. Cl. 2012), *aff'd*, 737 F.3d 750 (Fed. Cir. 2013), and *aff'd*, 737 F.3d 750 (Fed. Cir. 2013). " '[I]solated invasions, such as one or two floodings . . . do not make a taking . . . but repeated invasions of the same type have often been held to result in an involuntary servitude.' " *Ridge Line*, *Inc*. *v. United States*, 346 F.3d 1346, 1355-57 (Fed. Cir. 2003) (quoting *Eyherabide v.*

*United States*, 345 F.2d 565, 569 (Fed. Ct. Cl. 1965)); *see United States v. Cress*, 243 U.S. 316, 328 (1917) ("There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a permanent liability to intermittent but inevitably recurring overflows. . . .").

A flooding-based inverse condemnation claim requires a showing of causation—i.e., government action which caused the alleged flooding—since the government takes property only "when it directs a concentrated flow of water. . . ." *Drake*, 6 So. 3d at 720 (citations omitted); *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012) ("[G]overnment-induced flooding can constitute a taking. . . .") (citing *Pumpelly v. Green Bay Co*., 20 L.Ed. 557 (1872)); *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1360-61 (Fed. Cir. 2018) ("Proof of such a claim requires the plaintiffs to establish that government action caused the injury to their properties. . . ."); *Pinellas Cnty. v. Baldwin*, 80 So. 3d 366, 370 (Fla. 2d DCA 2012) ("Construction undertaken by a county which results in the flooding . . . with a degree of permanency may result in a taking. . . ."); *Assoc. of Meadow Lake*, *Inc. v. City of Edgewater*, 706 So. 2d 50, 52 (Fla. 5th DCA 1998) (held that plaintiffs stated a claim where they alleged continuous flooding during part of 1991 was caused by defendant's failure to construct a properly functioning storm water management system in association with the construction of a new park). To meet this burden, "a plaintiff must show that in the ordinary course of events, absent

government action, plaintiffs would not have suffered the injury." *St. Bernard Par*. *Gov't*, 887 F.3d at 1362; *see Mississippi v*. *United States*, 146 Fed. Cl. 693, 701 (2020). A plaintiff must show "what would have occurred" absent the government's action. *United States v*. *Archer*, 241 U.S. 119, 132 (1916); *see St. Bernard Par*. *Gov't*, 887 F.3d at 1362; *Mississippi*, 146 Fed. Cl. at 701. "Put simply, a plaintiff must show that governmental action proximately caused the property damage." *Devonwood-Loch Lomond Lake Ass'n Inc. v*. *City of Fayetteville*, No. 5:18-CV-270-D, 2021 WL 3476099, at *5 (E.D. N.C. Aug. 6, 2021) (citing *St. Bernard Par*. *Gov't*, 887 F.3d 1363-68).

Finally, "mere injury to the land not amounting to an appropriation of the land is insufficient" to support an inverse condemnation claim. *Williams Farms P'ship*, 2007 WL 1837911, at *2; *Village of Tequesta v*. *Jupiter Inlet Corp*., 371 So. 2d 663, 669 (Fla. 1979) ("When the governmental action is such that it does not encroach on private property but merely impairs its use by the owner, the action does not constitute a 'taking' but is merely consequential damage and the owner is not entitled to compensation."); *Certain Interested Underwriters At Lloyd's London Subscribing to Certificate No*. *TPCLDP217477 v*. *City of St*. *Petersburg*, 864 So. 2d 1145, 1149 (Fla. 2d DCA 2003) ("Damage or destruction that occurs as an unintended, incidental consequence of lawful activity by government actors does not constitute a compensable taking."); *Basore*, 723 So. 2d at 289 (finding crop destruction "was

17

a consequential damage resulting from the temporary flooding and not a constitutional taking."); *Dudley*, 137 So. 2d at 863 (requiring a permanent invasion and "not merely an injury to, the property").  If the "damage suffered is not a taking or an appropriation . . . then the damages suffered are *Damnum absque injuria* and compensation therefor by the public agency cannot be compelled."  *Village of Tequesta*, 371 So. 2d at 669 (citing *Weir v. Palm Beach Cnty.*, 85 So. 2d 865 (Fla. 1956)); *see also Bd. of Pub. Instruction of Dade Cnty. v. Town of Bay Harbor Islands*, 81 So. 2d 637, 642 (Fla. 1955) ("[T]he Florida Constitution . . . does not expressly forbid 'damage' to property without just compensation.").

### B.    The Amended Complaint does not contain sufficient factual matter which, if accepted as true, states an inverse condemnation claim.

Like the initial Complaint before it, the Amended Complaint's allegations are stated in exceedingly generalized terms.  Each plaintiff identically alleges his or her "property was used, and damaged or destroyed" by the City.  Dk. 27, ¶¶ 4-48.  They collectively allege their "property . . . was used, and damaged or destroyed, by Deltona as part of the Deltona Interconnect Program."  *Id.*, ¶ 53.  They claim the "flooding . . . caused severe damage to" them, and they list general categories of damage.  *Id.*, ¶ 85.  Then, under Counts I and II, they assert "Deltona's seizure of a drainage easement, to use Stone Island to create a floodplain, result[ed] in damage to and destruction of property in Stone Island. . . ."  *Id.*, ¶¶ 138, 146.

The Amended Complaint asserts generalized, conclusory allegations which do not support a conclusion that *each* named plaintiff suffered some manner of substantial interference with his or her property. Even the broad, generalized allegations complain of damage to, but not appropriation of, property. But, the analysis of whether flooding might amount to substantial interference with property, and/or an appropriation of property, must take into account the characteristics of the property at issue—i.e., *each* property at issue—and the specific impact ostensibly suffered as to the property relative to the alleged flooding. For example, putting aside the key issue of continuousness or expected recurrence (addressed below), superficial "flooding" in a yard is very different than, perhaps, waist-deep flooding in a living room. In the Amended Complaint, plaintiffs allege no actual facts in this respect whatsoever—quite intentionally, it seems, as it appears their intent is to bypass the basic rule 8 pleading requirements through collective reliance on the case's supposed suitability for class action certification. As pled, the Amended Complaint, like the initial Complaint before it, offers little more than a group chorus of "we were flooded" and "we were damaged." This is insufficient, and plaintiffs fail to plead valid claims of flood-related inverse condemnation. *See Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) ("[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.").

Moreover, the Amended Complaint fails to allege facts to support any permanency of an alleged flooding condition, or indicate the flooding is intermittent but will inevitably recur. *See Drake*, 6 So. 3d at 720 ("[T]he property owner must demonstrate that the government's action . . . will be continuous or reasonably expected to continuously recur. . . ."). Plaintiffs appear to concede the flooding associated with Hurricane Ian has abated, and the City has closed "the flood control structures." Dk. 27, ¶ 80.[11] Then, they generally and in conclusory terms assert the condition "may reasonably [be] expected to recur" and "may reasonably be expected to continually reoccur in the future." *Id*., ¶¶ 80, 82. These appear to be the Amended Complaint's only assertions that relate to supposed continuousness or continuous recurrence. But, simply saying in conclusory terms "it will happen again" without factual support is insufficient. *See Davila*, 326 F.3d at 1185. And, plaintiffs' new (and inconsistent, and incorrect) allegation that the "the flood control structures" remain open do not add support to their claim, since they still do not, and cannot, allege an actual, continuous or reasonably expected to continuously recur flooding condition—the very flooding they complain of was a one-time event associated with

---

[11] Again, the Amended Complaint is internally inconsistent. On the one hand, it alleges "up until at least January 2023, Deltona did not close the flood control structures." Dk. 27, ¶ 80. On the other, through allegations added via the Amended Complaint, plaintiffs allege "[a]s of the date of filing of this amended complaint, the flood control structures remain open." *Id.*

a catastrophic, once-in-a-lifetime hurricane.  Dk. 27, ¶ 65.  Unless some argument can be made (and supported by case law) that a one-time, catastrophic hurricane is a continuous or continuously recurring condition, plaintiffs have no supportable claim here.  And, the Amended Complaint does not allege that, even in absence of such a storm, the supposedly-open "flood control structure" *alone* will result in some flooding condition.  Rather, even accepting plaintiffs' general averment that the "flood control structure" is "open" and is a problem of some kind, it is only a problem in the event of a catastrophic hurricane, which plaintiffs do not (and cannot reasonably) allege is a continuous or continuously recurring condition.

Despite the effort to amend, plaintiffs still offer no facts that support their generalized, speculative "expected to recur" assertion, and merely allege a one-time flooding event associated with a catastrophic hurricane.  This is insufficient to support a valid inverse condemnation claim.  *See Ridge Line*, *Inc*., 346 F.3d at 1355-57 ("[I]solated invasions, such as one or two floodings . . . do not make a taking. . . ." (citation, internal quotation marks omitted)).  Plaintiffs' claims are essentially based on an apprehension of, or speculation as to, future flooding.  But, such apprehension is not sufficient to support an inverse condemnation claim.  *See Stueve Bros*. *Farms*, 105 Fed. Cl. at 764 ("[T]he apprehension of future flooding created by flood control legislation and the beginning of construction does not impose a flowage easement

on a property that may be burdened by future flooding." (citation, internal quotation marks omitted)).

Finally, the Amended Complaint is clear that plaintiffs truly complain of damage to their real or personal property, in association with a one-time flood event associated with a catastrophic hurricane. Through the Amended Complaint, they have amplified their damage claims. Dk. 27, ¶¶ 86-130. But, this does not serve to offer any additional support for their inverse condemnation claims. Putting aside whether claims of "damage" to property might, conceivably, support some other form of claim against a governmental entity, mere damage without occupation of property is not sufficient to support an inverse condemnation claim. *See Loretto*, 458 U.S. at 428 (distinguishing between "flooding cases involving a permanent physical occupation . . . and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages. . . ." (citations omitted)); *Williams Farms P'ship*., 2007 WL 1837911 at *2 ("[M]ere injury to the land not amounting to an appropriation of the land is insufficient."). As the Amended Complaint is pled, it merely asserts a claim for damages, and thus fails to allege a valid inverse condemnation claim.

In summary, the Amended Complaint does not "contain sufficient factual matter" which, if accepted as true, states an inverse condemnation claim. *Ashcroft*, 556 U.S. at 678. The Amended Complaint's assertions are generalized, formulaic,

and conclusory; the Amended Complaint fails to allege a flooding condition that is continuous or is reasonably expected to continuously recur; and at most plaintiffs assert a joint, general damage claim related to a one-time flooding event associated with a catastrophic hurricane.  The Amended Complaint's allegations do not support a claim for inverse condemnation, and it should be dismissed.

**7.    Conclusion**

For the reasons discussed, the City respectfully submits plaintiffs' Amended Complaint should be dismissed.

<u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Defendant certifies that:   A) it, through its undersigned counsel, conferred with plaintiffs before filing this motion; B) plaintiffs do not agree on the resolution of all or part of this motion; and C) this motion is opposed, and the conferral occurred via e-mail on August 15, 2023.

Respectfully submitted this 15th day of August, 2023.

ROPER, P.A.

By:    /s/ Dale A. Scott
        Dale A. Scott, Esq.
        Fla. Bar No. 568821
        dscott@roperpa.com
        ehemphill@roperpa.com
        2707 E. Jefferson St.
        Orlando, FL 32803
        Tel:  407-897-5150
        Fax:  407-897-3332
        Counsel for City of Deltona

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of this document has been furnished via e-mail on this

15th day of August, 2023, to:

       Thomas C. Allison, Esq.
       thomas@allisonpa.com
       Thomas C. Allison, P.A.
       5433 S. Bracken Ct.
       Winter Park, FL 32792
       Counsel for Plaintiffs

       Andrew Bernard Doyle, Esq.
       andrew@sd-firm.com
       micky@sd-firm.com
       Seibane Doyle, PLLC
       913 Mabbette St.
       Kissimmee, FL 34741
       Counsel for Plaintiffs

                By:   <u>/s/ Dale A. Scott</u>
                      Dale A. Scott, Esq.