UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAMIAN ANSON, et al.,

      Plaintiffs,

v.

CITY OF DELTONA, a Florida
Municipal corporation,

      Defendant.

Case No. 6:23-cv-00766-JSS-LHP

_____/

**DEFENDANT'S AMENDED MOTION FOR
FINAL SUMMARY JUDGMENT**

Defendant City of Deltona ("City"), pursuant to Federal Rule of Civil

Procedure 56, respectfully moves for final summary judgment as follows:

**1.    Introduction**

Plaintiffs are homeowners in the Stone Island Estates neighborhood ("Stone

Island") in Volusia County.  They sue the City with regard to flooding they suffered

after Hurricane Ian in September 2022.  They assert inverse condemnation claims, and

claim the City's management of its stormwater systems (lakes, ponds, control

structures, connecting pipes, etc.) caused the flooding they experienced.

For several reasons, the City submits it is entitled to final summary judgment.

**2.    Plaintiffs' claims**

Plaintiffs claim the City has a drainage system whereby storm water drains from

areas of the City, namely the Lake Theresa Basin, to Lake Bethel, located east of Stone

Island.  Doc. 27, ¶¶ 57-60.  They claim the pipe connecting Lake Doyle to Lake Bethel was "bricked up" from 2005, until Hurricane Ian struck in September 2022, and the City "opened the flood control structure," i.e., opened the Lake Doyle to Lake Bethel Emergency Overflow Interconnect ("Emergency Interconnect").  *Id.*, ¶¶ 61, 67.

Plaintiffs' Amended Complaint asserts identical inverse condemnation, or "taking," claims under the United States and Florida Constitutions:

> Deltona's opening of a certain flood control structure (and what ended up being three structures) allowed the Lake Theresa Basin (Lake Doyle) to discharge to Lake Bethel, and then directly to the west to, through, and over Stone Island. This resulted in the use of, and damage and destruction to, property owned by the Stone Island Homeowners and the Class, and constituted a seizure or physical invasion of their property rights.

*Id.*, ¶¶ 136, 144.

Plaintiffs claim the City has taken a "drainage easement, for the diversion of water to, through, and over Stone Island. . . ."  *Id.*, ¶¶ 134, 142.  They claim this "result[ed] in damage to and destruction of property" and "constitutes a taking . . . and is permanent in nature."  *Id.*, ¶¶ 138, 146.

**3.    The Stone Island neighborhood, Lake Monroe, and the St. Johns River.**

The aptly named Stone *Island* Estates neighborhood is located on the northeastern shore of Lake Monroe, and is surrounded by connected waterways (i.e., Lake Monroe, Bethel Creek, and other man-made waterways, drainage canals, and ditches).  Doc. 91-1, JSAMF, ¶ 2.[1]  Stone Island borders the Lake Monroe Wildlife Management Area to the southeast.  *Id.*, ¶ 5.  To the north is an undeveloped wetland

---

[1] "JSAMF" refers to the parties' Joint Stipulation of Agreed Material Facts.  Doc. 91-1.

area which is surrounded by Lake Monroe, waterways, and canals.  *Id.*, ¶ 6.  Lake Bethel and associated wetlands lie east of the neighborhood.  *Id.*, ¶ 7.

As an island surrounded by water, Stone Island is subject to varying levels of inundation and flooding caused by Lake Monroe's water levels.  Doc. 93-22, Hamstra rpt., 7/8/25, p. 8.[2]  Topographic maps show Stone Island's elevation varies from 1.0 feet, NAVD along the western edge of the island, to 9.0 feet, NAVD for a few areas in the center of the island.  *Id.*[3]  All of Stone Island is within FEMA's 100-year flood zone.  Doc. 93-1, Flood Zone Map, 2017; Doc. 93-22, Hamstra rpt., p. 7.

Lake Monroe is an 8,771-acre natural lake.  Doc. 91-1, JSAMF, ¶ 3.  Florida's longest river, the St. Johns River, runs to, and through, Lake Monroe.  *Id.*, ¶ 4.  Hydrologically speaking, the lake and the river, at the point of the lake, are one and the same.   Doc. 93-22, Hamstra rpt., p. 2.  Lake Monroe receives stormwater runoff and drainage via the river from the Upper and Middle St. Johns River Basins, which have a total contributing area of 1,870,720 acres.  *Id.*, p. 5.  St. Johns River's headwaters originate at Blue Cypress Lake in Indian River County.  *Id.*  Given the river's substantial contributing watershed, Lake Monroe responds slowly to daily rainfall, and only experiences measurable water level and discharge rate increases due

---

[2] Hamstra prepared and signed his report in accordance with rule 26.  He also executed a declaration which reaffirms and verifies his report and his opinions provided therein.  Doc. 93-23.

[3] "NAVD" refers to "North American Vertical Datum," which is "the official vertical datum of the United States. . . ."  Doc. 93-22, p. 7, n. 4.  "A vertical datum is a reference to which various heights / elevations are referenced."  *Id.*

to long-term above average rainfall and/or significant events like tropical storms and hurricanes. *Id.*, p. 7.

In the last 85 years, Lake Monroe's water levels have varied from -1.5 feet to 7.98 feet, NAVD. *Id.*, p. 8. Its highest recorded crest of 7.98 feet, NAVD occurred on October 9, 2022, after Hurricane Ian passed through the area. *Id.*, p. 3.

**4.    Hurricane Ian**

According to the National Hurricane Center:

Ian made landfall in southwestern Florida at category 4 intensity (on the Saffir-Simpson Hurricane Wind Scale), producing catastrophic storm surge, damaging winds, and historic freshwater flooding across much of central and northern Florida. Ian was responsible for over 150 direct and indirect deaths and over $112 billion in damage, making it the costliest hurricane in Florida's history and the third-costliest in United States history.

Doc. 93-24, Truchelut rpt., 7/1/25, p. 2 (quoting https://www.nhc.noaa.gov/data/tcr/AL092022_Ian.pdf).[4]

Hurricane Ian was a historic and highly impactful rain event for Central Florida, including the Middle and Upper St. Johns River Basins comprising Seminole County, northern Orange County, southern Volusia County, and northern Brevard County. *Id.*, p. 3. Beginning at midnight on September 28, 2022, and ending at 11:59 p.m., on September 30, 2022, Ian produced the following rain totals:

- Volusia – 10 to 16 inches, with local totals up to 20 inches;
- Seminole – 12 to 14 inches, with local totals up to 16 inches;

---

[4] Dr. Truchelut prepared and signed his report in accordance with rule 26. He also executed a declaration which reaffirms and verifies his report and his opinions provided therein. Doc. 93-25.

- Orange – 8 to 12 inches, with local totals up to 16 inches; and
- Brevard – 7 to 12 inches, with local totals up to 14 inches.

*Id.*, p. 4-6.

The expected recurrence of Ian's 24-hour rainfall totals between 7:00 a.m. on September 28, and 7:00 a.m. on September 29, 2022, across the Middle and Upper St. Johns River Basins, ranges from once every 100 years, to once every 200 years, or greater. *Id.*, p. 6, 12 (ex. 4), 18 (ex. 10). And, given Ian's 20- to 40-mile swath of 1-in-100 year or greater expected rainfall recurrences produced from September 28 to 30, 2022, as the storm moved through the Middle and Upper St. Johns River Basins, the total recurrence/return period for a rain event of Ian's extent and severity across the Middle and Upper St. Johns River Basins is once every 200 years. *Id.*, p. 6.

**5.    The City's actions before and after Hurricane Ian involving the Emergency Interconnect.**

The Emergency Interconnect provides an emergency stormwater overflow connection between Lake Doyle and Lake Bethel. Doc. 91-1, JSAMF, ¶ 11; Doc. 93-20, Theresa Basin outfall maps/diagrams. The inflow to the connection is a gated weir control structure at Lake Doyle's on southwest shore. Doc. 91-1, JSAMF, ¶ 12. From there, a pipe runs underground to a 60-inch outfall structure located at Audubon Park roughly half-a-mile to the southwest of Lake Doyle. *Id.*, ¶ 13. Water which empties from the Audubon Park outfall flows through ditches cut into low-lying and wetland areas, and conveyance structures, until it reaches a north/south running canal, or ditch, which connects to Lake Bethel, and eventually to Lake Monroe. *Id.*, ¶ 14.

The City maintains the Emergency Interconnect pursuant to St. Johns Water Management District ("SJRWMD") permit number 4-127-87817-1.  Doc. 91-1, JSAMF, ¶ 10; Doc. 93-2, Permit, 7/12/05.  The permit, as issued, called for a weir structure at Lake Doyle, and a brick-and-mortar plug at the Audubon Park outfall structure.  Doc. 93-21, Wallace dec., 8/13/25, ¶ 7.[5]  These redundant mechanisms came about because of administrative challenges (Florida Division of Administrative Hearings Case No. 04-002399) pursued two decades ago by individuals who lived on Lake Theresa.  *Id.*  Such individuals complained—and to this day complain—the interconnect, if open, causes Lake Theresa's water level to inordinately drop.  *Id.*

On September 23, 2022, Governor DeSantis issued Executive Order 22-218, which declared a State of Emergency for specific counties related to an approaching tropical depression, which became Hurricane Ian.  Doc. 91-1, JSAMF, ¶ 16; Doc. 93-3, Exec. Order 22-218.  Among other things, Order 22-218 waived procedures and formalities to allow municipal public works departments to perform necessary actions to ensure public health, safety, and welfare.  Doc. 93-21, Wallace dec., ¶ 8.  On September 24, 2022, Governor DeSantis issued Executive Order 22-219, which amended Order 22-218 and declared a State of Emergency for the entire state.  Doc. 91-1, JSAMF, ¶ 16; Doc. 93-4, Exec. Order 22-219.

---

[5] As discussed below, the permit has been modified to remove the requirement of a brick-and-mortar plug.  Doc. 93-19, Modified Permit 87817-11.

On September 29, 2022, Hurricane Ian passed through the area, and the City received approximately 14.5-inches of rain, leading to significant flooding of hundreds of homes, and closures of Elkcam Boulevard and Catalina Boulevard (both major collector roads). Doc. 93-21, Wallace dec., ¶ 9. Pursuant to the authority provided under Executive Orders 22-218 and 22-219, on September 29, 2022, the City removed the brick-and-mortar plug from the Emergency Interconnect. *Id*. Then, on October 1, 2022, the City opened the Lake Doyle weir to allow the controlled flow of water through the interconnect. *Id*. The above actions were taken on an emergency basis to relieve significant flooding that was occurring in the City. *Id*.

During this time, the City's consulting engineer, David Hamstra, P.E., was in contact with SJRWMD regarding the City's actions. Doc. 93-21, Wallace dec., ¶ 10. On October 6, 2022, Hamstra requested an Emergency Field Authorization ("EFA") from SJRWMD to allow the operation of the Emergency Interconnect for 90 days. Doc. 91-1, ¶ 21. Hamstra submitted various documents to support the City's request, including a spreadsheet showing areas of the City that were experiencing flooding as of October 3, 2022, and photographs of the flooding. Doc. 93-5, Hamstra email re EFA (with attachments).

On October 11, 2022, Hamstra submitted additional information concerning the EFA request to SJRWMD. Doc. 91-1, ¶ 22; Doc. 93-8, Hamstra email, 10/11/22, p. 2. His email states "[b]ased on these current conditions, and the significant flooding that has taken place within the Lake Theresa watershed, an [EFA request] was

7

submitted on 10/06/22 for review and approval to allow the three (3) variable [weir] gates to remain open for 90 days." Doc. 93-8, p. 2.   Among other things, Hamstra informed SJRWMD:

- Based on the rating curve prepared and submitted to the SJRWMD, the discharge rate associated with the Lake Doyle Overflow System with all three (3) gates open is approximately 70 cfs.

- Based on the USGS Stream Gauge (No. 02234500) located on U.S. Highway 17/92 (immediately west of Interstate 4), the current discharge in the St. Johns River is approximately 17,000 cfs.

- Based on the discharge rate from the overflow system and the current flow in the river, the Lake Theresa watershed is only contributing 0.4% of the total flow [of the St. Johns River].

*Id.*

On October 13, 2022, SJRWMD issued the requested EFA. Doc. 91-1, JSAMF, ¶ 23; Doc. 93-9, EFA, 10/13/22. The EFA's "Project Location" section explains the Emergency Interconnect "commences at . . . Lake Doyle where a pipe . . . . conveys stormwater runoff through an integrated system of pipes, water level control structures, berms, and swales, into Lake Bethel and eventually into Lake Monroe." Doc. 93-9, p. 1. The EFA's "Authorized Activity" section explains:

> Due to the associated rainfall resulting from Hurricane Ian, the City of Deltona requests emergency authorization to open a brick and mortar plug from Lake Doyle 60-inch outfall pipe to allow the Lake Theresa Basin to discharge to Lake Bethel and eventually to lake Monroe. This request is made in an effort to lower the water levels within the Theresa Basin due to unprecedented flooding conditions caused by Hurricane Ian's associated rainfall, which has caused severe roadway, yard and structural flooding of nearby properties extending from Catalina Boulevard to Doyle Road, in Deltona, Florida. Refer to the attached Lake Doyle Daily Lake Readings from 9/28/22 to 10/06/22.

*Id.*

On December 6, 2022, SJRWMD issued another EFA which extended the emergency authorization for 90 days.  Doc. 91-1, JSAMF, ¶ 24; Doc. 93-10, EFA, 12/6/22.  SJRWMD subsequently issued three EFAs to allow the Emergency Interconnect to remain open due to the continuing effects of Hurricane Ian and Hurricane Nicole (November 2022).  Doc. 91-1, JSAMF, ¶ 25; Doc. 93-11, EFA, 8/28/23 (30-day extension); Doc. 93-12, EFA, 9/29/23 (90-day extension); Doc. 93-13, EFA, 12/19/23 (extension to 3/31/24).  During this period, the interconnect was open from October 1, 2022, to April 10, 2024.  Doc. 93-21, Wallace dec., ¶ 14.

SJRWMD later issued several EFAs to allow the interconnect to be opened due to Tropical Storm Debby (August 2024) and Hurricane Milton (October 2024).  Doc. 91-1, JSAMF, ¶ 26; Doc. 93-14, EFA, 8/2/24 (authorization through 10/2/24); Doc. 93-15, EFA, 10/4/24 (extension to 10/31/24); Doc. 93-16, EFA, 11/1/24 (extension to 12/6/24); Doc. 93-17, EFA, 12/20/24 (extension to 2/28/25); Doc. 93-18, EFA, 2/28/25 (extension to 5/2/25).  During this period, the interconnect was open from October 10, 2024, to February 28, 2025.  Doc. 93-21, Wallace dec., ¶ 15.

Meanwhile, on November 22, 2024, SJRWMD issued a modified permit which removed the brick-and-mortar plug requirement from the permit conditions.  Doc. 91-1, JSAMF, ¶ 27; Doc. 93-19, Modified Permit 87817-11.

## 6.  Summary judgment standard.

Under rule 56(a), the movant "bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence

of a genuine issue of material fact." *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836,

840 (11th Cir. 2000). When the nonmovant bears the burden of proof on an issue, the

movant "need not support its motion with affidavits or other similar material negating

the opponent's claim to discharge this initial responsibility. Instead, the moving party

simply may show—that is, point out to the district court—that there is an absence of

evidence to support the nonmoving party's case. *Id.* (internal citation, quotation, and

alterations omitted); *see Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1174 (11th Cir.

2024) ("[A] party . . . can win . . . in two ways: with affirmative evidence showing

that the other side cannot win, or by pointing out an absence of evidence supporting

the other side's claims." (citation omitted)).

If the movant satisfies this initial burden, the burden shifts to the nonmovant to

show the existence of a genuine issue of material fact. *Rice-Lamar*, 232 F.3d at 840.

"[T]he mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 247-48 (1986) (emphases in original). The nonmovant must provide

more than a "mere scintilla of evidence." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th

Cir. 1990) (citation omitted); *Daniels v. Jacobs*, 753 F. App'x 748, 755 (11th Cir. 2018)

("Inferences based on speculation and a mere scintilla of evidence . . . will not

suffice. . . .") (citations omitted). If the non-movant fails to make "a sufficient showing

on an essential element of her case with respect to which she has the burden of proof,"

the movant is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**7.    Flooding-based inverse condemnation and taking claims.**

Inverse condemnation, or "taking," claims may arise under the United States Constitution and the Florida Constitution. U.S. Const. amend. V.; Art. X, § 6, Fla. Const.[6] A taking can occur when the government "requires the landowner to submit to the physical occupation of his land." *Fla. Game & Fresh Water Fish Comm'n v. Flotilla, Inc.*, 636 So. 2d 761, 764 (Fla. 2d DCA 1994) (citation omitted). When action "merely impairs [the property's] use by the owner, the action does not constitute a 'taking' but is merely consequential damage and the owner is not entitled to compensation." *Village of Tequesta v. Jupiter Inlet Corp.*, 371 So. 2d 663, 669 (Fla. 1979); *see Fla. E. Coast Properties, Inc. v. Metro. Dade Cnty.*, 572 F. 2d 1108, 1110 (5th Cir. 1978) ("[T]here is a well-recognized distinction between damage and taking. . . .").

As the Florida First District Court of Appeal has explained, the government takes property in the context of flooding:

> when it directs a concentrated flow of water from one property onto another, permanently depriving the owner of all beneficial enjoyment of their property. *Leon County v. Smith*, 397 So. 2d 362, 364 (Fla. 1st DCA 1981); *Martin v. City of Monticello*, 632 So. 2d 236, 237 (Fla. 1st DCA 1994). To assert an inverse condemnation claim based on such governmental action, the property owner must demonstrate that the government's action constitutes a substantial interference with her private property rights for more than a momentary period,

---

[6] "The Takings Clause of the Florida Constitution is identical to that of the United States Constitution, and accordingly, the two can be analyzed coextensively." *Persaud Properties FL Invs., LLC v. Town of Fort Myers Beach, Fla.*, 593 F. Supp. 3d 1129, 1137 (M.D. Fla. 2022) (citing *Highlands-In-The-Woods, L.L.C. v. Polk Cnty.*, 217 So. 3d 1175, 1180 (Fla. 2d DCA 2017)).

11

and will be continuous or reasonably expected to continuously recur, resulting in a substantial deprivation of the beneficial use of her property. . . .

*Drake v. Walton Cnty.*, 6 So. 3d 717, 720-21 (Fla. 1st DCA 2009); *see Modern, Inc. v. Fla.*, 2008 WL 239148, at *8 (M.D. Fla. Jan. 28, 2008) ("[S]tate action that causes flooding on abutting private property may constitute a taking where the flooding is a permanent invasion of land amounting to an appropriation.") (citation omitted).

Again, a taking-by-flooding plaintiff must demonstrate the flooding "will be continuous or reasonably expected to continuously recur. . . ." *Drake*, 6 So. 3d 717, 720 (citations omitted). As the Court of Federal Claims has similarly explained:

> without a demonstrable pattern, a few isolated floodings are insufficient to support a just compensation claim based on flooding. Although courts have held that the repeated, though temporary, inundation of land can be a physical taking requiring compensation, *see, e.g., United States v. Cress*, 243 U.S. 316, 328, 37 S.Ct. 380, 61 L.Ed. 746 (1917), flooding that can be characterized as a random occurrence, not inevitably recurring, does not amount to a taking of property, *see, e.g., Wilfong v. United States*, 202 Ct. Cl. 616, 622, 480 F.2d 1326 (1973). Stated differently, "isolated invasions, such as one or two floodings . . . , do not make a taking . . . , but repeated invasions of the same type have often been held to result in an involuntary servitude." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1357 (Fed. Cir. 2003) (alterations in original) (quoting *Eyherabide v. United States*, 170 Ct. Cl. 598, 604, 345 F.2d 565 (1965)). This is because "[i]n order for a taking to occur, the effect of such flooding must be permanent rather than simply a random event induced more by an extraordinary natural phenomenon than by Government interference." *Wilfong*, 202 Ct. Cl. at 622, 480 F.2d 1326.

*Angelly v. United States*, 173 Fed. Cl. 768, 787 (2024); *see United States v. Cress*, 243 U.S. 316, 328 (1917) ("There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a permanent liability to intermittent but inevitably recurring overflows. . . .").

A taking-by-flooding claim requires a showing of causation—i.e., government action which caused the flooding—since the government takes property only "when it directs a concentrated flow of water. . . ." *Drake*, 6 So. 3d at 720 (citations omitted); *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012) ("[G]overnment-induced flooding can constitute a taking. . . .") (citing *Pumpelly v. Green Bay Co.*, 20 L.Ed. 557 (1872)); *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1360-61 (Fed. Cir. 2018) ("Proof of such a claim requires the plaintiffs to establish that government action caused the injury to their properties. . . ."). To hold the government responsible for floods it did not cause:

> would be to say that the Fifth Amendment requires the Government to pay a landowner for damages which may result from conjectural major floods, even though the same floods and the same damages would occur had the Government undertaken no work of any kind. So to hold would far exceed even the 'extremest' conception of a 'taking' by flooding within the meaning of that Amendment. For the Government would thereby be required to compensate a private property owner for flood damages which it in no way caused.

*United States v. Sponenbarger*, 308 U.S. 256, 265 (1939).

To satisfy the causation burden, "a plaintiff must show that in the ordinary course of events, absent government action, plaintiffs would not have suffered the injury." *St. Bernard Par. Gov't*, 887 F.3d at 1362. A plaintiff must "present evidence comparing the flood damage that actually occurred to the flood damage that would have occurred if there had not been government action at all." *Id.* at 1363; *see United States v. Archer*, 241 U.S. 119, 132 (1916) (requiring a claimant to show "what would have occurred" absent government action). "Put simply, a plaintiff must show that

governmental action proximately caused the property damage." *Devonwood-Loch Lomond Lake Ass'n Inc. v. City of Fayetteville*, No. 5:18-CV-270-D, 2021 WL 3476099, at *5 (E.D. N.C. Aug. 6, 2021) (citing *St. Bernard Par. Gov't*, 887 F.3d 1363-68).

In terms of proof, "[c]ausation of flooding is a complex issue which must be addressed by experts." *Hendricks v. United States*, 14 Cl. Ct. 143, 149 (1987); *see Loesch v. United States*, 645 F.2d 905, 914 (1981) (observing expert testimony "is particularly appropriate" where "the trier of fact is presented with evidence of a highly technical nature involving geotechnical, hydrologic, hydraulic, geological and climatic matters"). Lay testimony regarding flooding is "entitled to little weight in determining causation." *Alost v. United States*, 73 Fed. Cl. 480, 505 (2006); *see Herriman v. United States*, 8 Cl. Ct. 411, 420 (1985) ("[S]uch [lay] testimony regarding causation shall be accorded little weight. . . . These witnesses testified as to what both parties agree is a hydrological issue, which can be evaluated and interpreted by experts."). And, where a plaintiff must offer expert testimony on an issue but offers none, a court should grant summary judgment for the defendant. *See Thompson v. Brisk Transp.*, 401 F. App'x 826, 828 (4th Cir. 2010); *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 838-39 (7th Cir. 2015); *Pride v. BIC Corp.*, 218 F.3d 566, 580-81 (6th Cir. 2000).

Additionally, "a taking only results when the government intends to invade a protected property interest or the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003)

14

(citations and internal quotation marks omitted)).  "In addition to causation, an inverse condemnation plaintiff must prove that the government should have predicted or foreseen the resulting injury." *Moden v. United States*, 404 F.3d 1335, 1343 (Fed. Cir. 2005).

The Sixth Circuit Court of Appeals recently explained the intentional action-requirement as follows:

> When a government bears responsibility for flooding private property, it may be liable for a taking or a tort.  On the one side of the line:  If the government permanently and intentionally floods a property, the courts treat it as a taking.  Consider a few examples.  In one case, a State intentionally increased the lake waters behind a dam and indefinitely subsumed a farmer's land.  That, the Supreme Court held, rose to the level of a taking.  *Pumpelly v. Green Bay Co.*, 80 U.S. (13 Wall.) 166, 176, 181, 20 L.Ed. 557 (1871).  In another case, the government built a lock and dam that subjected the land below it to inevitable and frequent overflows.  That, the Court also held, amounted to a taking.  *United States v. Cress*, 243 U.S. 316, 327-28, 37 S.Ct. 380, 61 L.Ed. 746 (1917).  A taking occurred because the government intended the invasion, or, at the very least, knew that intrusion was "the direct, natural, or probable result of an authorized activity."  *Golf Vill. N., LLC v. City of Powell*, 14 F.4th 611, 621 (6th Cir. 2021) (quotation omitted).

> On the other side of the line:  An unintended, temporary flood attributable to state action does not amount to a taking, even though it may rise to the level of a tort.  *Cf. Ark. Game & Fish Comm'n*, 568 U.S. at 36–39, 133 S.Ct. 511.  Consider a few examples.  No taking occurred when the federal government built a canal with an inadequate spillway, which briefly flooded nearby properties during especially heavy rains but did not prevent their long-term use.  *Sanguinetti*, 264 U.S. at 147-49, 44 S.Ct. 264.  The plaintiff failed to show that the flooding was a purposeful or necessary result of the canal's construction.  *Id.* at 147-50, 44 S.Ct. 264.  Any damage was "indirect and consequential, for which no implied obligation on the part of the government c[ould] arise."  *Id.* at 150, 44 S.Ct. 264.  No taking likewise occurred when a government did not have the "foresight" to see a lake water's "destination nor purpose to appropriate the properties" near a lake.  *John Horstmann Co. v. United States*, 257 U.S. 138, 146, 42 S.Ct. 58, 66 L.Ed. 171 (1921).  A government's negligent infliction of injury on property does not by itself a taking make.  *See Golf Vill. N., LLC*, 14 F.4th at 621; *Bd. of Supervisors of Issaquena Cnty. v. United States*, 84 F.4th 1359, 1365 (Fed. Cir. 2023).

*Bruneau v. Mich. Dep't of Env't*, 104 F.4th 972, 975-76 (6th Cir. 2024); *see Certain Interested Underwriters At Lloyd's London Subscribing to Certificate No. TPCLDP217477 v. City of St. Petersburg*, 864 So. 2d 1145, 1149 (Fla. 2d DCA 2003) ("Damage or destruction that occurs as an unintended, incidental consequence of lawful activity . . . does not constitute a compensable taking. . . . [R]edress for incidental damage caused by government actors must sound in tort." (citations omitted)).

Finally, a taking may be non-compensable if there is "the destruction of real and personal property, in cases of actual necessity, to . . . forestall . . . grave threats to the lives and property of others." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014, n. 16 (1992) (internal quotation marks and quoted source omitted). The necessity doctrine, "absolves the government of liability for the property it destroys in responding to the emergency." *Orr v. United States*, 166 Fed. Cl. 1, 74 (2023) (citation omitted). Three requirements must be met: "(1) actual emergency; (2) imminent danger; and (3) actual necessity of the [g]overnment action." *Id.* (internal quotation marks and quoted source omitted). Along related lines, Florida courts hold if the government act "creates a public benefit it is more likely an exercise of eminent domain, whereas if a public harm is prevented it is more likely an exercise of the police power" and thus non-compensable as a taking. *Graham v. Estuary Prop.*, 399 So. 2d 1374, 1381 (Fla. 1981); *see Hansen v. City of Deland*, 32 So. 3d 654, 656 (Fla. 5th DCA 2010) ("A taking is more likely to have occurred when a governmental action confers a public benefit rather than prevents a public harm." (citing *Graham*, 399 So. 2d at 1381)).

16

8.    **The City is entitled to summary judgment.**

A.    **There is no record evidence to show the City caused any flooding of plaintiffs' properties.**

"[A] plaintiff must show that in the ordinary course of events, absent government action, plaintiffs would not have suffered the injury," and "present evidence comparing the flood damage that actually occurred to the flood damage that would have occurred if there had not been government action at all." *St. Bernard Par. Gov't*, 887 F.3d at 1362-63. And, "[c]ausation of flooding is a complex issue which must be addressed by experts." *Hendricks*, 14 Cl. Ct. at 149.

Plaintiffs allege the City's opening of the Emergency Interconnect caused their properties to flood. Doc. 27, ¶¶ 73-77. But, despite the passage of over two years since this case was filed, there is no record evidence—namely, expert testimony or evidence—to support any argument that *but for* the City's actions, plaintiffs' properties would not have flooded.

Presumably, plaintiffs will attempt to rely on Shelly Brooks, E.I., who they proffered as an expert witness.[7] In Brooks' report, after stating the City "uses pump systems and emergency overflow structures to address flooding issues," she opines: "Individually these methods may not cause significant downstream or upstream effects, but in my professional opinion, the short-term approach to solving the flooding

---

[7] Plaintiffs describe Brooks as a certified floodplain manager and water resource engineer. She is not a Florida licensed professional engineer. Doc. 93-26, Brooks dep., p. 17-21. The City has filed a motion to strike or exclude Brooks based on her and plaintiffs' failure to comply with rule 26's expert disclosure and report requirements, and under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Doc. 94.

has caused flooding on Stone Island during a high intensity and short duration storm."
Doc. 53-1, Brooks rpt., Sept. 2024, p. 16.   However, her report did not explain the
basis for her conclusion, much less quantify the City's supposed contribution to any
flooding condition.   This renders her opinion unsupported *ipse dixit*, and her report in
violation of rule 26(a)(2).   *See Am. Traditions Ins. Co. v. Whirlpool Corp.*, No. 6:12-CV-
1639-ORL-19T, 2013 WL 4648476, at *2 (M.D. Fla. Aug. 29, 2013) ("An expert
witness' report must provide the substantive rationale in detail with respect to the basis
and reasons for the proffered opinions.   It must explain factually why and how the
witness has reached them. . . . An expert's report must include how and why the expert
reached a particular result, not merely the expert's conclusory opinions." (internal
quotation marks and quoted sources omitted)).   Moreover, during Brooks' deposition
she repeatedly acknowledged she did not conduct modeling nor perform calculations
to support her theories.   Doc. 93-26, Brooks dep., 6/6/25, p. 25-27, 32-33, 47-49, 52-
53, 55.   Brooks simply does not address the question of what would have happened if
the City never opened the Emergency Interconnect.

*Devonwood-Loch Lomond Lake Association*, *supra*, decided in the Eastern District
of North Carolina, is similar to this case, and involved taking claims based on
allegations "that the City [of Fayetteville]'s stormwater mismanagement, when
coupled with flooding from Hurricane Matthew, resulted in a taking of [plaintiffs]
property."   *Id.*, 2021 WL 3476099 at *1.   The court considered whether plaintiffs'

retained expert provided evidence of causation sufficient to avoid summary judgment for Fayetteville.  The court held he did not:

> Plaintiffs argue that their expert, Douglas Jewell ("Jewell"), analyzed causation in his report and testimony.  *Compare* [D.E. 74] 8 *and* [D.E. 82] 4-5 *with* [D.E. 77] 7-8.  Plaintiffs retained Jewell to assess the condition of the four dams after Hurricane Matthew and to provide a cost estimate for repairs.  *See* Jewell Dep. [D.E. 79-9] 46-48.  Jewell, however, did not investigate what would have happened to the dams absent the City's alleged stormwater mismanagement. *See id*. at 94.  Rather, Jewell's report merely noted that the lakes and dams formed "a component of the City's stormwater management infrastructure." Jewell Rep. [D.E. 79-8] 12, 19, 31.  Moreover, Jewell opined that the "failure of these dams is also the culmination of years of stormwater being routed through these facilities[,]" that "the degradation of these facilities ha[d] been ongoing for many years," and that Hurricane Matthew was "the straw that broke the camel's back."  Jewell Dep. [D.E. 79-9] 163.  Furthermore, Jewell did not examine whether the dams could have ever withstood Hurricane Matthew even absent the alleged stormwater mismanagement.  Jewell also did not compare the actual flood damage with hypothetical flood damage absent the alleged government action. *Cf. id*. at 91-94.  Thus, Jewell's expert testimony fails to create a genuine issue of material fact about causation.

*Id*. at *6.

The same manner of analysis, as applied in *Devonwood-Loch Lomond Lake Association*, can be applied to any effort by plaintiffs here to rely upon Brooks' report and opinions.

Plaintiffs lack evidence to prove causation on the City's part.  As they are unable to make a sufficient showing on an essential element, the City is entitled to summary judgment.  *See Celotex Corp.*, 477 U.S. at 323 (holding that if the non-movant fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the movant is entitled to summary judgment).

19

**B.    The City's engineering expert's unrebutted opinion supports a conclusion that the City did not cause flooding.**

The City's engineering expert David Hamstra, P.E., opines "the City did not cause the alleged flooding condition, in that its actions relative to its stormwater management systems had no appreciable effect upon Lake Monroe's water level before, during, and after Hurricane Ian. . . ."  Doc. 93-22, Hamstra rpt., p. 3-4.  He continues, "any flooding plaintiffs experienced was caused due to the historically high water levels of Lake Monroe, which (again) the City did not affect by its actions, nor exacerbate to any appreciable extent," and the historically high water levels were "caused by Hurricane Ian. . . ."  *Id*.  In terms of quantifying the effect the City's actions had upon Lake Monroe, he explains:

> [D]uring its peak discharge after Hurricane Ian, Lake Monroe / St. Johns River experienced a peak stage of 7.98 feet, NAVD (an all-time high figure), with a maximum flow of approximately 16,800 cfs.  Based on the hydraulic rating curve I prepared for submission to SJRWMD, the peak discharge rate for the Lake Doyle structure, through which water was released from the Thersea Basin into Lake Bethel and ultimately Lake Monroe, was estimated at 75 cfs.  This approximate flow rate was based on the following conditions:
>
> • Depth of water above the weir opening associated with the Lake Doyle Emergency Overflow Structure;
>
> • The number of gates opened (one, two, or three); and
>
> • The "controlling" flow rate associated with orifice flow and weir flow associated with the overflow structure and pipe flow associated with the 48-inch x 76-inch outfall pipe.
>
> Accordingly, the flow from the Lake Doyle structure accounted for only 0.45% of the total water flow of Lake Monroe / St. Johns River (i.e., 75 cfs / 16,800 cfs = 0.0045, or 0.45%).   From an engineering perspective, this 0.45% contribution was *de minimis*, and would have had no true, measurable impact

upon Lake Monroe's water level. Indeed, the 0.45% contribution would amount to less than half an inch of water in the lake.

To illustrate the stark difference between 75 cfs and 16,800 cfs, one might consider that Lake Monroe holds roughly 3,820,647,600 cubic feet of water (8,771 acres and assume a depth of 10 feet), and if suddenly Lake Monroe were emptied, and refilling commenced at a 75 cfs flow rate, it would take over 19 months to refill the lake. But, at the 16,800 cfs flow rate, the lake would be refilled in approximately 2.6 days.

Doc. 93-22, Hamstra rpt., p. 10-11 (fn. 7 and 8 omitted).

To meet the causation burden, "a plaintiff must show that in the ordinary course of events, absent government action, plaintiffs would not have suffered the injury." *St. Bernard Par. Gov't*, 887 F.3d at 1362. Hamstra's opinion is clear—the City's actions in opening the Emergency Interconnect had "no true, measurable impact upon Lake Monroe's water level." Doc. 93-22, Hamstra rpt., p. 11. So, absent the City's action, Lake Monroe would have been essentially at the same level it was in the days and weeks after Hurricane Ian, and plaintiffs would have flooded just the same.

Notably, Hamstra's report also includes Lake Monroe water level data from Tropical Storm Fay (2008) and Hurricane Irma (2017). *Id.*, p. 9. This data shows a significant rise in the lake level, and significant parts of Stone Island would have flooded during those events. *Id.*, p. 9, 36-37 (ex. 4-5). However, the Emergency Interconnect was closed during these storms, which cuts against any argument that the interconnect causes significant increases in lake levels during heavy rain events.

Bottom line, plaintiffs' flooding was caused by Hurricane Ian, which was a historic rain event that inundated the Middle and Upper St. Johns River Basins with levels of rainfall expected to recur only once every 200 years. As the rainfall drained

21

into the river and made its way north to Lake Monroe in the days after Ian, the lake

reached an all-time high level.  This did not occur due to stormwater passing through

the Emergency Interconnect, which was a drop in the proverbial bucket compared to

the amount of water moving through the river and in the lake.

Accordingly, based upon Hamstra's unrebutted and supported expert opinion,

plaintiffs' claims fail for lack of causation.

### C.    The record contains no evidence of a flooding condition that is continuous or continuously recurring, or inevitably recurring.

To prove a taking-by-flooding claim, a plaintiff must prove a flooding condition

that is "continuous or reasonably expected to continuously recur. . . ."  *Drake*, 6 So.

3d 720; *see Angelly*, 173 Fed. Cl. at 787 ("[W]ithout a demonstrable pattern, a few

isolated floodings are insufficient. . . ." (citations omitted)).

At most, plaintiffs have alleged, and there may be record evidence to support,

the occurrence of a one-time flood event which occurred in the days and weeks after

Hurricane Ian.  But, there is no evidence that such an event has occurred in similar

form since Ian, much less that there has been a demonstrable pattern of flooding in the

intervening (nearly) three years.  To the contrary, via interrogatory answers, each

plaintiff has identically acknowledged:

> Since the commencement of this action, Plaintiff has not yet experienced any
> flooding similar in nature to the flooding experienced following Hurricane Ian
> (that is, flooding of the duration, nature, and intensity experienced following
> Hurricane Ian and the opening of the interconnect by Deltona).  Plaintiff is
> concerned and expects that similar flooding will reoccur if Deltona were to
> reopen the Interconnect Structure.

22

Doc. 93-27 (composite), Pls' Unverif. Responses to 2nd Interrogs., 8/1/25.

Plaintiffs thus acknowledge the one-time nature of the event. And, their unsupported, lay assertion that "similar flooding will reoccur" does not amount to competent evidence to establish inevitable recurrence or a repeating condition. That said, their "similar flooding will reoccur" assertion has already proven incorrect. As indicated, the Emergency Interconnect remained open long after plaintiffs' flooding abated, i.e., until April 10, 2024. Doc. 93-21, Wallace dec., ¶ 14. And, the interconnect was again open from October 10, 2024, to February 28, 2025 (during and after Hurricane Milton). *Id.*, ¶ 15. Plaintiffs offer no claims, and more importantly proof, of flooding that occurred during that time—when the interconnect was open—similar in nature to the flooding alleged in this action.

If "a few isolated floodings are insufficient," *Angelly*, 173 Fed. Cl. at 787, certainly, a *single* isolated flooding is insufficient. As there is no evidence of a condition that is continuous or continuously recurring, repetitive, or inevitably recurring, plaintiffs' inverse condemnation claims fail.

> **D.    The record contains no evidence of an intentional taking or that the City foresaw that its actions would cause plaintiffs to flood, and assuming the City caused plaintiffs to flood, such flooding was an unintended, incidental result of the City's lawful actions.**

"[A] taking only results when the government intends to invade a protected property interest or the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." *Ridge Line*, 346 F.3d at 1355 (citations and internal quotation marks omitted).

Here, there is no evidence that the City intended to invade plaintiffs' property via flood waters, or flooding of Stone Island was the direct, natural, or probable result of the City's activities as to opening the Emergency Interconnect.  Such lack of evidence alone entitles the City to summary judgment.

That said, the evidence shows that, upon seeking an EFA, the City submitted documentation which offered the City's analysis that its act of opening the Emergency Interconnect would not have an appreciable effect upon Lake Monroe.  Doc. 93-8. This is the antithesis of a showing of an intentional effort to take property by raising Lake Monroe's water level, or that flooding was objectively foreseeable.  At most, assuming the opening of the interconnect affected Lake Monroe, plaintiffs are left with a claim that as an unintended consequence of the City's actions, Stone Island flooded—essentially, a negligence claim.  But, "[a] government's negligent infliction of injury on property does not by itself a taking make." *Bruneau*, 104 F.4th at 976.

Accordingly, plaintiffs' claims fail for lack of proof that the City intended to take, i.e., flood, their properties, or that the City could have reasonably foreseen that its actions would cause their properties to flood.

### E.    The City is entitled to protection under the necessity doctrine.

To be entitled to protection under the necessity doctrine, the City must show its targeted actions, which allegedly led to flooding of Stone Island, were taken pursuant to an actual emergency, there was imminent danger, and there was actual need for the City's action.  *Orr*, 166 Fed. Cl. at 74.

24

Indeed, there was an actual emergency and imminent danger. The Governor issued emergency declarations as Hurricane Ian approached. Docs. 93-3, -4. And, there was a need for the City to act—it was facing imminent risk to life and property based upon significant, active flooding within the City that would be relieved by opening the Emergency Interconnect. Docs. 93-5, -6, -7, -8, -9. Notably, the "Lake Doyle to Lake Bethel *Emergency* Overflow Interconnect" could only to be used in the event of an emergency, and the City sought permission from SJRWMD to open, and keep the interconnect open via "*Emergency* Filed Authorization" requests, which were handled on an expedited basis. Docs. 93-9, -10. And, SJRWMD explicitly recognized the nature of the emergency the City faced. Doc. 93-9, p. 1 ("Authorized Activity" section); Doc. 93-10, p. 1 ("Authorized Activity" section). Because the undisputed record evidence satisfies the doctrine of necessity, the City is entitled to summary judgment on this basis alone.

Relatedly, "[a] taking is more likely to have occurred when a governmental action confers a public benefit rather than prevents a public harm." *See Hansen*, 32 So. 3d at 656 (citing *Graham*, 399 So. 2d at 1381). The evidence shows the City, in opening the interconnect, was acting to prevent public harm, as opposed to conferring a public benefit. For this additional reason, the City is entitled to summary judgment.

## 9.    Conclusion

For the various reasons discussed, the City respectfully submits it is entitled to final summary judgment.

Respectfully submitted this 22nd day of August, 2025, by:

By:    /s/ Dale A. Scott
       Dale A. Scott, Esq.
       Fla. Bar No. 568821
       dscott@tessmari.com
       ehemphill@tessmari.com
       Tessitore Mari Scott, PLLC
       1485 International Pkwy., Ste. 2031
       Lake Mary, FL 32746-5352
       Tel: 321-363-1634
       Fax: 321-319-9095
       Counsel for City of Deltona

## CERTIFICATE OF SERVICE

I certify that a copy of this document has been furnished via e-mail on this 22nd

day of August, 2025, to:

Thomas C. Allison, Esq.
thomas@allisonpa.com
Thomas C. Allison, P.A.
121 S. Orange Ave., Ste. 840N
Orlando, FL 32801-3233
Co-counsel for Plaintiffs

Andrew Bernard Doyle, Esq.
andrew@sd-firm.com
micky@sd-firm.com
Seibane Doyle, PLLC
913 Mabbette St.
Kissimmee, FL 34741
Co-counsel for Plaintiffs

By:    /s/ Dale A. Scott
       Dale A. Scott, Esq.